1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   KIRK KOBOS,                                 CASE NO. CV-F-09-856 LJO SKO

12              Plaintiff,                        **ORDER ON DEFENDANTS' SUMMARY
                                                  JUDGMENT MOTION** (Doc. 39)
13         vs.

14   SCHWAN'S HOME SERVICE, INC., and
     STEVE HOUSELOG,
15
                  Defendants.
16   _____/

17                              **INTRODUCTION**

18        Defendants Schwan's Home Service, Inc. ("Schwan's") and Steve Houselog ("Mr. Houselog")[1]

19   (collectively "defendants") move for summary judgment against plaintiff Kirk Kobos ("Mr. Kobos")

20   pursuant to Fed. R. Civ. P. 56.  Defendants argue that they are entitled to judgment in their favor on Mr.

21   Kobos' claims for wrongful termination, discrimination, retaliation, wage and labor law violations,

22   unfair competition, and intentional infliction of emotional distress.  Conceding his wage, labor, and

23   unfair competition claims, Mr. Kobos opposes defendants' motion.  Mr. Kobos argues that disputed

24   material facts preclude summary adjudication of his wrongful termination, discrimination, retaliation,

25   failure to prevent, and intentional infliction of emotional distress claims.  For the following reasons, this

26   Court GRANTS summary judgment in favor of defendants and against Mr. Kobos.

27   _____

28        [1] Although a previous order found that Mr. Kobos failed to state a claim against Mr. Houselog, and that Mr. Houselog
     was a fraudulent defendant, Mr. Houselog remains a defendant in this action.

                                        1

1        **B**ACKGROUND[2]

2        **Defendants' Motion for Summary Judgment**

3                        **Introduction**

4        Schwan's is a subsidiary of The Schwan Food Company, the largest branded home delivery

5    frozen food company in the United States. (Houselog Decl. ¶4).  Schwan's is the home sales and home

6    delivery branch of The Schwan Food Company. (*Id*.).  Schwan's sells and delivers Schwan's branded

7    food products directly to end-user customers at their residences. (*Id*.).  Schwan's sales companies are

8    housed in depots, which are free-standing Schwan's facilities containing an office, freezer and parking

9    spaces. (*Id.*, ¶ 5).

10       Mr. Houselog is the Local General Manager for the Schwan's depot in Bakersfield, California.

11   (*Id*., ¶ 2).  In February 2008, Mr. Houselog interviewed Mr. Kobos for the position of Customer Service

12   Manager Trainee. (Houselog Depo. 36:22 - 36:24).  Mr. Houselog told Mr. Kobos that he was required

13   to participate in a ride along or shadow day as part of the hiring process. (Kobos Depo. 75:4 - 76:17).

14   Mr. Houselog explained to Mr. Kobos that during job shadowing, applicants are not allowed to work

15   and that they are only riding along to observe.  Mr. Houselog further advised Mr. Kobos that Schwan's

16   is not responsible for any injuries that job applicants may incur during their ride along. (Houselog Depo.

17   101:23 - 103:14).  According to Mr. Houselog, Schwan's did not consider Mr. Kobos a Schwan's

18   employee in February 2008. (*Id*. at 49:17).  Mr. Kobos admits that he did not believe he was "fully

19   hired" as of February 2008. (Kobos Depo. 149:22 - 150:2).

20                         **Waiver**

21       The parties dispute whether Mr. Kobos signed a waiver prior to his February 2008 shadow day.

22   According to defendants, Mr. Kobos signed a document titled, "Candidate/Passenger Authorization -

23   Waiver and Release From Liability for Vendor Ride-Along or Pre-Employment Job Shadowing

24   Opportunity," which reads, in relevant part:

25           Schwan does NOT provide accident insurance for participants during ride-along.
26           Participants assume all inherent risk of injury resulting from their involvement in the ride
             along.

27   ───────────

28       [2]The Court relies on the evidence presented by the parties in the record and cites to the most relevant for purposes of deciding this motion.

The candidate/passenger, for him/herself, (and his/her heirs, executors, administrators, successors, agents and assignees) agrees and acknowledges that Schwan expressly denies any liability, for any and all claims, demands, or suits of any kind on account of or resulting from damage to property or personal injuries that may be caused by or result from any accident which may occur while the candidate/passenger participates in a ride along in a Schwan commercial motor vehicle.

The candidate/passenger releases, acquits and forever holds harmless and covenants not to sue Schwan, its former, present, and future agents, servants, employees, heirs, executors, predecessors, officers, partners, personal representatives, administrators, attorneys, insurer and all other related persons, customers, vendors, firms, corporations, associations, or partnerships, including but not limited to all successors and assigns, from any and all claims, rights, actions, suits and causes of action under all federal, state or local statutes, laws, ordinances, rules and regulations for all claims whatsoever, known and unknown, foreseen and unforeseen, which the candidate/passenger may now have or which he/she may hereafter in the future have on account of, arising from, or in any way
connected directly or indirectly with, or otherwise related to participation in the aforementioned ride along or any occurrences prior to the date this Agreement is executed, and covenants and agrees not to file or pursue any lawsuit, charge, claim, right or any litigation arising out of or related to any aspect of said ride along as shown below under the signature affixed hereto.

**The candidate/passenger agrees that he/she is not an employee of Schwan, will not receive any compensation, benefits or workers compensation for time spent during ride-along, and will not engage in any work, including but not limited to driving, unloading, carrying or selling product. The candidate/passenger agrees that he/she ONLY may observe driving, unloading, carrying and selling techniques for the purpose of assessing career opportunities at Schwan.**

Defs. Ex. 4.  Mr. Kobos admits he signed the form, but states that the rest of the form was filled out by someone else, including the date.  (Kobos Depo. 131:5 - 133:8).  The date on the document is February 22, 2008.  (Defs. Ex. 4).  Mr. Kobos does not remember signing the waiver before his ride along in February 2008, but does recall signing it in September 2008 when he re-applied to work at Schwan's.  (Kobos Depo. 115:22 - 117:5).

### February 2008 Injury

Mr. Kobos injured his ankle during his shadow day on February 26, 2008.  (Kobos Depo. 86:19 - 86:25).  While exiting the Schwan's truck in front of a customer's house, Mr. Kobos fell to the ground.  He felt his ankle twist and heard his ankle pop. (*Id*. at 87:4 - 87:10).  Mr. Eubanks, who accompanied Mr. Kobos on the shadow day, did not offer assistance.  Instead, the Schwan's customer, Katrina Graves, gave Mr. Kobos an ice pack and Motrin.  Mr. Houselog never spoke with Mr. Kobos about how the ankle injury occurred, and Mr. Kobos did not  submit medical expenses related to his first ankle injury to Schwan's (Houselog Depo. 79:4 - 79:11,124:25 - 125:8).

3

1

**Schwan's Employs Mr. Kobos**

2          Following Mr. Kobos' ankle injury, Mr. Houselog contacted Mr. Kobos every few weeks to ask

3   how he was doing and whether he was able to come back to work.  (Kobos Depo. 117:18 - 118:2).  In

4   September 2008, Mr. Kobos received an unrestricted medical release from his doctor.  (*Id*. at 122:18 -

5   123:4).  When Mr. Houselog called Mr. Kobos in September 2008, Mr. Kobos told Mr. Houselog about

6   his medical release.  (*Id*. at 121:9 - 121:20).  Mr. Houselog responded by asking Mr. Kobos if he was

7   interested in working at Schwan's.  Mr. Kobos expressed his continued interest in working at Schwan's.

8          Mr. Kobos reapplied to work at Schwan's in September 2008.  (*Id*. at 123:5 - 123:21).  He was

9   required to fill out the application paperwork again and go on another shadow day.  (*Id*. at 120:5 -

10  120:8).  After completing the necessary pre-requisites, Mr. Kobos became conditionally employed by

11  Schwan's on September 10, 2008.  (*Id*. at 141:19 - 142:22).

12         For the first month and a half of his employment, Mr. Kobos drove a Schwan's truck and went

13  door-to-door to deliver products to customers. (*Id*. at 162:7 - 162:25, 237:18 - 238:1).  Mr. Kobos also

14  engaged in "building" - soliciting new Schwan's customers through cold calling and knocking on front

15  doors. (Kobos Depo. 179:20 - 180:4).  "Builders" drive Schwan's trucks while completing their normal

16  duties in anticipation of selling products to new customers.  (*Id*. at 180:5 - 180:16).  Builders take

17  customer information to create regular Schwan's customers by completing a building form.  (*Id*. at 178:8

18  - 178:15).  Mr. Houselog and Mr. Eubanks instructed Mr. Kobos to complete building forms when

19  soliciting new customers. (Houselog Depo. 135:11 - 135:20).

20

**November 2008 Injury**

21         Mr. Kobos contends that he re-injured his ankle while working during Thanksgiving week in

22  2008. (Kobos Depo. 191:20 - 192:1).  Defendants contend that Mr. Kobos never reported his injury to

23  Schwan's.  (Eubanks Depo. 38:13 - 38:16).  Mr. Kobos did not report his alleged injury by way of a

24  "Report of Injury" form.  (Kobos Depo. 192:19 - 192:24).  Additionally, Mr. Kobos sought no medical

25  treatment for the alleged injury that occurred in November 2008. (Kobos Depo. 265:16 - 265:21).  After

26  the injury, Mr. Kobos was able to walk and do his normal day-to-day activities, but experienced pain in

27  his ankle.  (*Id*. at 265:22 - 266:1).

28  ///

4

1

**Houselog/Kobos Argument**

2    On December 8, 2008, Mr. Kobos and Jimmy Hayes ("Mr. Hayes") were working for Mr.

3 Houselog at the Bakersfield depot. (Houselog Depo. 251:22 - 252:1). That morning, Will Taylor ("Mr.

4 Taylor"), a Customer Service Manager, reviewed a map with Mr. Kobos and Mr. Hayes. Mr. Taylor

5 showed them the areas on the map that needed more customers and wrote down the respective dates that

6 Mr. Taylor would be delivering Schwan's products. (*Id*. at 160:13 - 160:24, 159:17 - 160:22, 161:3 -

7 161:5). Such dates - called "call-back dates" - are the dates that new and existing Schwan's customers

8 are visited by a Schwan's Customer Service Manager, who will offer Schwan's products for purchase.

9 (*Id*. at 155:20 - 155:22).

10    Later that evening, Mr. Houselog had a discussion with Mr. Kobos at the Bakersfield depot.

11 (Kobos Depo. 204:7 - 204:18). During the conversation, Mr. Houselog asked Mr. Kobos about the

12 Recommended Truck Inventory ("RTI") forms that Mr. Kobos was filling out. (Houselog Depo. 155:11

13 - 155:19). An RTI ensures that when a route driver visits a customer on the next call-back date, the

14 truck's inventory will contain the customer's requested product. (*Id*. at 155:13 - 155:22). According to

15 Mr. Houselog, Mr. Kobos could not complete the RTI because he did not know the proper call-back date

16 to include on the form. (*Id*. at 159:12 - 159:16). Mr. Houselog pointed out that Mr. Kobos should have

17 known the date, because it was written on the map given to him by Mr. Taylor earlier that morning. (*Id*.

18 at 159:17 - 159:21). Mr. Houselog then asked Mr. Kobos to go retrieve the map that listed the recorded

19 call-back dates. (I*d*. at 163:18 - 164:1). Mr. Kobos went outside to look for the map, came back in, and

20 told Mr. Houselog that he could not find it. (*Id*. at 165:2 - 165:14).

21    When Mr. Kobos returned without the map, Mr. Houselog became irritated. Mr. Houselog began

22 to discuss other work-related matters with Mr. Kobos. Specifically, Mr. Houselog spoke of the

23 importance of filling out building forms. Mr. Kobos admitted that he completed no building forms that

24 day. (Houselog Depo. 168:4 - 168:10). According to Mr. Houselog, Mr. Kobos said he did not fill out

25 building forms because "he wasn't a census taker" and didn't have time. (*Id*. at 169:1 - 169:4). Mr.

26 Kobos also explained that he did not fill out any building forms because Mr. Hayes filled them out.

27 (Kobos Depo. 207:5 - 207:10).

28    Mid-conversation, Mr. Kobos told Mr. Houselog, "Well, I'm leaving now." (Houselog Depo.

5

169:21 - 169:22).  As Mr. Kobos was walking out, Mr. Houselog responded: "Well, if you leave before the conversation is over, then you are not going to work tomorrow." (Houselog Depo. 169:22 - 169:24).  Mr. Kobos walked out of the office.

After a few minutes, Mr. Kobos returned to the office and asked Mr. Houeslog whether he was fired.  Mr. Houselog told Mr. Kobos that he was suspended for walking out. (Houselog Depo. 122:7 - 122:21).  After Mr. Kobos left the depot, Mr. Houselog looked inside the truck that Mr. Kobos had used and found the map.  (Houselog Depo. 167:16 - 167:21).

**Mr. Kobos' Termination**

On December 9, 2008, Mr. Houselog informed his district manager that he had suspended Mr. Kobos the prior evening.  (Houselog Depo. 290:15 - 291:4).  Mr. Houselog informed human resources, his divisional manager and some salespeople about the suspension. (*Id*. at 123:2 - 123:4).  Mr. Houselog tried to contact Mr. Kobos to inform him that he was suspended indefinitely, but could not reach him at his home number or his cell number. (*Id*. at 123:8 - 123:16).  According to Mr. Houselog, Mr. Kobos hung up on him when Mr. Houselog tried to arrange a termination meeting. (*Id*. at 132:3 - 132:5).  Mr. Houselog then informed the corporate office that he was unable to reach Mr. Kobos.  (*Id*. at 123:21 - 123:24).  Human resources instructed Mr. Houselog to send a certified termination letter to Mr. Kobos with his final paycheck. (Houselog Depo. 267:14 - 267:21).  Mr. Houselog sent the letter.  (*Id*. at 267:24 - 268:2).  A December 17, 2008 letter to Mr. Kobos signed by Mr. Houselog reads:

> You ha[v]e previously been trained on the proper use of the building form, and this process has been reiterated to you on multiple occasions. Despite multiple directives from both the Assistant Location General Manager and me that you use this form properly, you have refused to do so.
>
> On December 8, 2008, I again attempted to instruct on the necessity of using this form in the proper manner. Your response was that 'the building form was a waste of time.' During this meeting, you abruptly stated that you were leaving. I informed you that if you 'walk out on me now before we finish this conversation, then do not come in on Tuesday.' You elected to leave the building anyway,
> despite this direction. You returned approximately five minutes later and turned in your wallet, $40, keys, and deposit and asked if you were fired. I then informed you that you were not fired but you were being suspended for insubordination – both for refusing to use the building forms and for walking out of the meeting.  Based on what transpired, further investigation of your conduct was warranted by Human Resources.
>
> After further review of your conduct, it has been determined that you were insubordinate and unprofessional in the course of business.

6

1   According to Mr. Houselog, although the termination later refers to Mr. Kobos' refusal to utilize the

2   building forms, he would not have recommended Mr. Kobos' termination if Mr. Kobos had not walked

3   out of the December 8, 2008 conversation. (Houselog Depo. 254:23 - 255:3).  Mr. Kobos was terminated

4   on December 16, 2008.  (Kobos Depo. 159:17 - 159:21).

5                                          **Mr. Kobos' Opposition**

6          Mr. Kobos contends that the following additional facts support his claims of wrongful

7   termination, disability discrimination, and retaliation:

8                            **Workers' Compensation Claim For February Injury**

9          Mr. Kobos contends that he did not file a workers' compensation claim or submit any medical

10  expenses related to his first ankle injury because he felt he did not have a claim.  (Kobos Depo. 124:25 -

11  126:10).   Mr. Kobos avers that Mr. Houselog led him to believe he did not have a workers'

12  compensation claim for his first injury, because of statements he made before the shadow day.  (Mr.

13  Kobos 126:4 - 127:9).  In his deposition, Mr. Kobos explained that he did not submit medical bills to

14  Schwan's related to this February injury before he was hired in September 2008, because he "was led

15  to believe that [he] signed away [his] right to claim" by the waiver, which he recalls has "some mention

16  of workers' comp in it." (Kobos Depo., 125:1-24).

17         Mr. Kobos submits an August 19, 2009 letter entitled "Notice Regarding Denial of Workers'

18  Compensation Benefit" that is addressed to Mr. Kobos.  The letter indicates the date of loss to be

19  February 2, 2008, and advises Mr. Kobos of the "status of [his] Workers' Compensation injury of

20  2/2/2008."   According to the notice, Mr. Kobos' claim was denied because, during the initial

21  investigation, it was determined that Mr. Kobos was not employed at Schwan's at the time of the injury.

22                    **November 2008 Injury and Second Workers' Compensation Claim**

23         Mr. Kobos re-injured his ankle while working on Thanksgiving Day in 2008.  (Kobos Depo.

24  191:20 - 192:1). According to Mr. Kobos, he immediately attempted to report his injury to Mr. Eubanks,

25  but Mr. Eubanks ignored him.  (Kobos Depo. 192:13 - 192:18).  Mr. Eubanks denies that Mr. Kobos

26  informed him of the injury.   In his deposition, Mr. Kobos admits to filing a second workers'

27  compensation claim related to the November 2008 injury.  According to Mr. Kobos, his second claim

28  was denied.

**Houselog/Kobos Argument**

On December 8, 2008, Mr. Houselog and Mr. Kobos had a conversation after Mr. Kobos had clocked out for the evening.  (Kobos Depo. 204:3 - 206:5).  According to Mr. Kobos, Mr. Houselog questioned him about different things and every time Mr. Kobos would answer, Mr. Houselog would shift to another question.  (*Id*. at 205:23 - 206:14).  Mr. Kobos perceived Mr. Houselog's questions to "continue endlessly," with some questions repeated. (*Id*. at 205:23 - 206:14).  Some of the questions were also instructions.  (*Id*. at 206:15 - 206:16).

Mr. Kobos testified that when Mr. Houselog asked him to go outside and look for the map, Mr. Kobos told Mr. Houselog that he did not know where the map was.  (*Id*. at 207:1 - 207:10).  In response to further questions about the building forms, he told Mr. Houselog that Mr. Hayes filled them out.  Mr. Kobos testified that he felt harassed by Mr. Houselog, and as a result of the harassment, Mr. Kobos started shaking.  (*Id*. at 207:11 - 207:17).  Mr. Kobos then went outside, looked for the map and came back inside.  (*Id*. at 207:16 - 207:17).

When Mr. Kobos returned, Mr. Houselog told him not to come into work the next day.  (Kobos Depo. 207:16 - 207:18).  Mr. Kobos asked why he was not allowed to work the next day and Mr. Houselog told him it was because he had walked out of an ongoing conversation.  (*Id*. at 207:17 - 207:20).  According to Mr. Kobos, Mr. Houselog told him he was not fired.  (*Id*. at 207:21 - 207:24). Mr. Kobos then left everything he had with him for the day on the counter and departed.  (*Id*. at 208:2 - 208:4).

**Mr. Kobos' Termination**

According to Mr. Kobos, he and Mr. Houselog spoke twice on the phone after the December 8, 2008 argument.  (Kobos Depo. 212:23 - 213:3).  During the first telephone conversation Mr. Kobos called Mr. Houselog and asked about his job status with the company.  (*Id*. at 213:25 - 214:13).  Mr. Kobos was not told that he was suspended or that he had been written up.  (*Id*. at 214:10 - 214:11). During the second phone conversation, Mr. Houselog called Mr. Kobos and asked him to come into the office. (*Id*. at 214:25 - 215:6).  Mr. Kobos responded by asking if he was fired, but Mr. Houselog would not tell Mr. Kobos his employment status.  (*Id*. at 215:4 - 215:9).  Mr. Kobos told Mr. Houselog to call him back when Mr. Houselog knew what his job status was.  (*Id*. at 215:4 - 215:9).  That was the end of

1   the conversation.  (*Id*. at 215:4 - 215:9).

2   Mr. Kobos sent Schwan's a letter to inquire about his job status. (Kobos Depo. 214:11 - 214:13).

3   Mr. Kobos was next contacted by Schwan's when he received his termination letter, dated December

4   17, 2008.  (*Id*. at 215:13 - 215:19).

5   **Intentional Infliction of Emotional Distress**

6   Mr. Kobos asserts his claim of intentional infliction of emotional distress based on his

7   conversation with Mr. Houselog on December 8, 2008, his wrongful termination, Schwan's

8   discriminatory conduct against him, and other instances set forth below.

9   Mr. Kobos claims he was "left in the dark" with regard to his employment status after the

10   December 8, 2008 conversation. (Kobos Depo. 209:18 - 209:24).  During that conversation, Mr. Kobos

11   was told by Mr. Houselog not to call the office, and that Mr. Houselog would contact him. (*Id*. at 208:8 -

12   209:24).  Mr. Kobos was not told if he was fired or if he could start looking for another job.  (*Id*. at

13   209:18 - 209:24).

14   According to Mr. Kobos, Mr. Houselog knew about Mr. Kobos' second ankle injury in

15   November 2008.  (*Id*. at 210:19 - 211:6).  Mr. Kobos believes Mr. Houselog made him solicit door-to-

16   door on his injured ankle, instead of sending him on routes where Mr. Kobos would be required to drive

17   from one location to the next.  (*Id*. at 210:19 - 211:6).

18   Mr. Kobos believes he was being asked to do illegal activities, such as soliciting in parking lots

19   without the proper license.  (*Id*. at 211:9 - 211:12).

20   Mr. Kobos also believes Mr. Houselog would ignore him, refuse to talk with him and concealed

21   information vital to Mr. Kobos' productivity.  (*Id*. at 208:24 - 209:5).

22   Mr. Kobos received $600 per week for the first six weeks of work, when Mr. Kobos claims that

23   he was told he would receive $700 per week.  (Kobos Depo. 219:1 - 221:16).

24   Mr. Kobos' handheld device would work one day with one printer, but would need to be

25   reprogrammed the next day.  (*Id*. at 211:23 - 212:5).  Mr. Kobos is uncertain why this was a problem,

26   but asserts that he was the only employee with this problem.  (*Id*. at 212:1 - 212:5).

27   **Mr. Kobos' Claims**

28   In his complaint, originally filed in the Superior Court of California, County of Kern, Mr. Kobos

9

1   asserts ten causes of action against defendants for: (1) wrongful termination (Cal. Gov't Code §12940);

2   (2) wrongful termination (Workers' Compensation Act); (3) discrimination based on disability; (4)

3   retaliation; (5) failure to prevent discrimination and retaliation; (6) violation of wage and hour

4   laws–unpaid overtime wages (Cal. Labor Code §510); (7) violation of wage and hour laws–failure to

5   pay minimum wage; (8) violation of wage and hour laws–waiting time penalties; (9) unfair competition

6   (Cal. Bus. & Prof. Code §17200); and (10) intentional infliction of emotional distress.

7        Defendants moved for summary judgment on June 15, 2010.  Mr. Kobos opposed the motion on

8   July 6, 2010.  Defendants replied on July 13, 2010.  This Court found this motion suitable for decision

9   without a hearing, vacated the July 20, 2010 hearing pursuant to Local Rule 230(g), and issues the

10  following order.

11                          **STANDARD OF REVIEW**

12       On summary judgment, a court must decide whether there is a "genuine issue as to any material

13  fact."  Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  A party

14  seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of

15  material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may satisfy

16  this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving

17  party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient

18  evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving

19  party bears the burden of proof at trial.  *Id*. at 322.  "The judgment sought should be rendered if the

20  pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine

21  issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

22  P. 56(c).  "If the party moving for summary judgment meets its initial burden of identifying for the court

23  those portions of the material on file that it believes demonstrates the absence of any genuine issues of

24  material fact," the burden of production shifts and the nonmoving party must set forth "specific facts

25  showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,

26  809 F.2d 626, 630 (9th Cir. 1987)(quoting Fed. R. Civ. P. 56(e)).

27       To establish the existence of a factual dispute, the opposing party need not establish a material

28  issue of fact conclusively in its favor, but "must do more than simply show that there is some

                                        10

metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587.   It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."   *First National Bank of Arizona v. Cities Serv. Co*., 391 U.S. 253, 290 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631.   The nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.   Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial."   "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

With these standards in mind, the Court turns to defendants' arguments.

**DISCUSSION**

**Conceded Claims**

Defendants moved for summary adjudication against Mr. Kobos on all claims.   In Mr. Kobos' opposition, he conceded claims six through nine, explaining that "for those [claims] involving wages, overtime pay, etc., . . . Plaintiff concedes so that the Court does not need to consider them . . .[.]" (Kobos Opp., p. 1).   Where a motion for summary adjudication is unopposed, it successfully demonstrates that no genuine issues of material fact remain, and summary adjudication is warranted on the merits. *Martinez v. Stanford*, 323 F.3d 1178, 1181 (9th Cir. 2003).   Accordingly, defendants are entitled to summary adjudication in their favor on Mr. Kobos' sixth through ninth causes of action.

**Wrongful Termination and Discrimination Claims**

Mr. Kobos argues that "every act that occurred" after the February 2008 injury was "part of a coverup intended to create a way to deprive [Mr. Kobos] access to the workers' compensation insurance system and to avoid the duty to evaluate the injury for disability discrimination purposes." (Kobos Opp., p. 2.)   Mr. Kobos disputes that he signed the waiver in February 2008 when he was injured.   Mr. Kobos contends that Mr. Houselog's subsequent undisputed "pattern of conduct"– including his  weekly calls to ask about Mr. Kobos' injury and whether he was able to work, and Mr. Houselog's subsequent request for Mr. Kobos to reapply for a job at Schwan's–demonstrates a calculated effort to obtain Mr. Kobos'

11

1   signature on the waiver to deprive Mr. Kobos access to worker's compensation.  Based on this theory,[3]

2   Mr. Kobos asserts the following state discrimination and wrongful termination claims against Schwan's:

3   (1) wrongful termination in violation of public policy pursuant to Cal. Gov't Code §12940; (2) wrongful

4   termination in violation of public policy pursuant to the Workers Compensation Act; (3) disability

5   discrimination; (4) retaliation; and (5) failure to prevent discrimination and retaliation.

6         Defendants move for summary adjudication of Mr. Kobos' first through fifth causes of action,

7   arguing that Mr. Kobos' contentions are "refuted by logic and law." (Defs. Memo., p. 8.)   Having

8   considered the parties' legal memoranda and exhibits attached thereto, this Court agrees.   For the

9   following reasons, this Court grants summary adjudication in favor of defendants and against Mr. Kobos

10  on Mr. Kobos' wrongful termination and discrimination claims.

11                                    **Wrongful Termination**

12        In his first and second causes of action, Mr. Kobos asserts that he was terminated wrongfully,

13  in violation of public policy.  In his first cause of action, he asserts that the terms and conditions of his

14  employment at Schwan's violated the public policy of the State of California; namely, Cal. Gov't. Code

15  §12920, which declares "that it is necessary to protect and safeguard the right and opportunity of all

16  persons to seek, obtain, and hold employment without discrimination" on the basis of physical disability.

17  Mr. Kobos asserts that defendants discriminated against him on the basis of his disability–to wit, the

18  work-related injuries to his ankle–by discriminating against and terminating him on the basis of his

19  disability.  Similarly, in his second cause of action, Mr. Kobos asserts that defendants terminated him

20  in violation of the public policy of California's Workers' Compensation Act, which declares "employers

21  are responsible for employees who sustain work-related injuries and are barred from interfering with an

22  employee's right to file for workers' compensation benefits."  Mr. Kobos claims that defendants

23  interfered with his rights with respect to his work-related injury by never informing him of his rights,

24

---

25         [3]Mr. Kobos' confused and disorganized opposition also asserts that the discrimination and wrongful termination
    claims survive summary judgment because of Schwan's failure to accommodate Mr. Kobos' disability.  Mr. Kobos's
26  argument is inapposite, as his complaint contains no failure to accommodate claim and no allegations that Schwan's failed
    to accommodate his alleged disability.  Moreover, Mr. Kobos' failure to accommodate argument is unsubstantiated, as he
27  provides no evidence that he requested an accommodation for his alleged disability and that Schwan's refused to
    accommodate him.  Additionally, Mr. Kobos relies on law specific to religious discrimination claims to support his disability
28  discrimination claim. Accordingly, even if Mr. Kobos' argument was applicable to his claims, his position would be denied.

and violated public policy by retaliating against and terminating him on the basis of his work-related injuries.

In *Tameny v. Atlantic Richfield Co.*, 27 Cal.3d 167, 178 (1980), the California Supreme Court "recognized that although employers have the power to terminate employees at will, they may not terminate an employee for a reason that is contrary to public policy." *Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1076 (2003) (quoted in *Silguero v. Creteguard, Inc.*, – Cal. Rptr. 3d. –, 2010 WL 2978222 (July 30, 2010)). The "public policy exception to the at-will employment rule must be based on policies carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions." *Little*, 29 Cal. 4th at 1077. "Moreover, the public policy that is the basis for such a claim . . . must have been articulated at the time of discharge, and must be fundamental and substantial. Thus, a legitimate *Tameny* claim is designed to protect a public interest and therefore cannot be contravened by a private agreement." *Id*. at 1077 (internal citations and quotations omitted). "What is vindicated through the cause of action is not the terms or promises arising out of the particular employment relationship involved, but rather the public interest in not permitting employers to impose as a condition of employment a requirement that an employee act in a manner contrary to fundamental public policy." *D'Sa v. Playhut, Inc.*, 85 Cal.App.4th 927, 932 (2000) (termination of employee for his failure to sign noncompetition agreement constituted wrongful termination in violation of public policy of section 16600).

Defendants argue that Mr. Kobos' wrongful termination claims fail because they had a legitimate, non-discriminatory reason to terminate his employment. Defendants submit evidence that Mr. Kobos was fired after he had an argument with Mr. Houselog and walked out. Defendants found Mr. Kobos' actions to constitute insubordination, and fired him for that reason. Mr. Houselog testified in his deposition that even though Mr. Kobos was not filling out his building forms, he would not have recommended his termination if Mr. Kobos had not walked away from their December 8, 2008 conversation.

Mr. Kobos admits that he had an argument with Mr. Houselog on December 8, 2008 and admits walking away. Mr. Kobos further admits that defendants considered Mr. Kobos to be insubordinate and fired him for that reason. Mr. Kobos maintains, however, that he was fired because of his disability and

1  in an attempt to interfere with his ability to file a workers' compensation claim.

2      Mr. Kobos presents no evidence to support his position that he was terminated in violation of

3  Workers' Compensation Act public policy.  Rather, the facts presented by Mr. Kobos suggest that

4  Schwan's did not interfere with his ability to file a workers' compensation claim.  Mr. Kobos admits in

5  his deposition that he filed separate workers' compensation claims for both the February and November

6  2008 injuries.  Thus, even if his claims were denied, Schwan's did not prevent Mr. Kobos from seeking

7  workers' compensation benefits.

8      In addition, Mr. Kobos' argument is inconsistent with his testimony and the evidence presented.

9  In his opposition, Mr. Kobos argues that he did not file a workers' compensation claim, because he was

10  led to believe that he signed away those rights in the waiver.  Although he does not remember signing

11  the waiver in February 2008, Mr. Kobos admits that he did not submit medical bills to Schwan's

12  between February and September 2008, because he recalled that the paperwork in February 2008

13  included a workers' compensation waiver and he was led to believe he signed his rights away.

14  Moreover, and inconsistent with this deposition testimony, Mr. Kobos argues repeatedly that he never

15  applied for workers' compensation benefits because Mr. Houselog led him to believe that he had no right

16  to a claim.  Mr. Kobos asserts that although he did not file a workers' compensation claim, "someone

17  at Schwan's must have notified the workers' compensation carrier about the existence of a potential

18  claim because the insurance administrator sent Mr. Kobos a letter denying his claim for workers'

19  compensation benefits after he injured himself in November 2008."  This argument is unsupported and

20  contradicted by the evidence.[4]

21      Similarly, Mr. Kobos presents no facts to substantiate his claim that Schwan's terminated his

22  employment in violation of FEHA public policy.  Mr. Kobos contends that his termination violates

23  California's public policy against disability discrimination.  For the reasons explained more fully below,

24  this Court finds Mr. Kobos fails to identify any evidence to support his theory of disability

25

26      [4] Pursuant to Fed. R. Civ. P. 11(b)(3), attorneys certify that the "factual contentions have evidentiary support."  Mr.
   Kobos' counsel repeatedly argues facts without evidentiary support, and purported facts that are contradicted by evidence
27  presented by his client and himself.  This Court admonishes Mr. Kobos' counsel that as an officer of this Court, he has a duty
   to abide by Fed. R. Civ. P. 11(b), and cautions Mr. Kobos' counsel that further questionable representations shall result in
28  an order to show cause why this Court should not impose sanctions.

discrimination.  Accordingly, defendants are entitled to summary judgment in their favor on Mr. Kobos' first and second causes of action.

### Discrimination

Mr. Kobos' third cause of action asserts a disability discrimination claim against defendants. California's FEHA provides, in relevant part, that "[i]t shall be an unlawful employment practice ... [¶] (a) For an employer, because of the ... physical disability [or] medical condition ... of any person, to refuse to hire or employ the person ... or to bar or to discharge the person from employment ...." Cal. Gov't. Code § 12940(a); *see also, Ross v. RagingWire Telecommunications, Inc.*, 42 Cal.4th 920, 925-926 (2008).   FEHA proscribes "discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her disability," referred to as disparate treatment discrimination. *Avila v. Continental Airlines, Inc.*, 165 Cal. App. 4th 1237, 1246 (2008) (citing *Knight v. Hayward Unified Sch. Dist.*, 132 Cal. App. 4th 121, 128-29 (2005)).  Mr. Kobos asserts a disparate treatment discrimination claim against Schwan's.

California courts analyze indirect or circumstantial discrimination claims under the shifting burden of proof framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), and reaffirmed in *St Mary's Honor Center v. Hicks & Co.*, 509 U.S. 502, 113 S.Ct. 2742(1993).  *See*, *Caldwell v. Paramount Uni. Sch. Distr.*, 41 Cal. App. 4th 189, 200 (1995) (applying a *McDonnell Douglas* analysis to discrimination under California's FEHA).

Under the burden-shifting framework of FEHA, Mr. Kobos must establish a prima facie case of disparate treatment discrimination in the workplace by demonstrating that: (1) he suffers from a disability; (2) he is qualified to do his job; (3) he suffered an adverse employment action; and (4) the defendant harbored discriminatory intent. *Avila*, 165 Cal. App. 4th at 1246; *see also*, *McDonnell Douglas*, 411 U.S. at 802.  If Mr. Kobos establishes his prima facie case, the burden shifts to Schwan's to rebut the presumption of discrimination. *McDonnell Douglas*, 411 U.S. at 802.  If Schwan's meets its  burden, the presumption of discrimination raised by the prima facie case "simply drops out of the picture." *St. Mary's*, 113 S.Ct. at 2747.  The burden shifts back to Mr. Kobos to establish that Schwan's stated reasons for the adverse employment action was pretext for unlawful discrimination. *Id*.; *Bradley v. Harcourt, Brace, and Co.*, 104 F.3d 267, 270 (1996).

**Mr. Kobos' Prima Facie Case**

Defendants argue that Mr. Kobos' claims fail because he was terminated for a legitimate, non-discriminatory reason, admits the factual basis of his termination, and cannot demonstrate pretext. For the first two sections of their argument, defendants assume arguendo that Mr. Kobos establishes a prima facie discrimination claim. Because this Court agrees that Mr. Kobos fails to establish pretext, this Court also assumes that Mr. Kobos establishes a prima facies discrimination case.[5]

**Defendants' Purported Non-Discriminatory Reasons for Action**

Defendants may rebut the presumption of discrimination by producing evidence of a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802. This burden of production is less than the burden of proving the absence of a discriminatory motive, since the burden of proving the cases rests with Mr. Kobos. *Nidds*, 113 F.3d at 916-17; *Clark v. Claremont University Center*, 6 Cal. App. 4th 639, 663-64 (1992).

Defendants successfully establish a non-discriminatory reason for Mr. Kobos' termination. Mr. Kobos was suspended, and later terminated, for insubordination. Mr. Houselog, Mr. Kobos' supervisor, had a meeting with Mr. Kobos on December 8, 2008. Mr. Kobos walked away from the meeting, mid-conversation. Although Mr. Kobos' termination letter references Mr. Kobos' failure to properly use building forms, Mr. Houselog would not have recommended Mr. Kobos' termination if Mr. Kobos had not walked out of the December 8, 2008 conversation. Mr. Kobos admits he left the ongoing discussion

---

[5] In the alternative, defendants argued that Mr. Kobos failed to establish a prima facie case, because he failed to establish that he suffered from a disability. Mr. Kobos ignored this later section of defendants' memorandum and erroneously argued in opposition that defendants conceded that Mr. Kobos successfully established a prima facie case. This is another example of Mr. Kobos' counsel's attempts to mislead this Court.

This Court agrees with defendants, in the alternative, that Mr. Kobos failed to establish that he suffered from a disability. A physical disability is broadly construed so that applicants and employees are protected from discrimination due to actual or perceived physical impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling. Cal. Gov't. Code § 12926.1(b). The physiological condition must be such that it "limits a major life activity." Cal. Gov't. Code § 12926(k)(1)(B)(ii). Mr. Kobos suffered an ankle injury in February 2008. Thereafter, Mr. Kobos received a full medical release from his doctor. Mr. Kobos had no medical restrictions when he reapplied to Schwan's and was hired. Mr. Kobos admits that he was able to walk immediately after the alleged November 2008 injury and at all times since. Mr. Kobos sought no medical attention after his November 2008 injury. There is no evidence that Mr. Kobos was unable to perform his regular work duties, that his injury interfered with his ability to perform his duties, or that he requested accommodation for his injury. Based on this evidence, Mr. Kobos fails to establish that he was disabled. *See, e.g., Muller v. Automobile Club of S. Cal.*, 897 F. Supp. 1289, 1294 (S.D. Cal. 1995) ("A broken leg, for example, would not be a disability...unless it did not heal properly and resulted in a permanent impairment significantly limiting the person's ability to walk."). Accordingly, Mr. Kobos fails to establish that he was a member of a protected class.

to go outside.  Insubordination is a legitimate, nondiscriminatory reason for termination, and therefore, the presumption of unlawful discrimination is eliminated. *Mata v. Southern Pacific Tranp. Co.*, 611 F. Supp. 330, 333 (N.D. Cal. 1984).  Based on this evidence, defendants have established a non-discriminatory reason for terminating Mr. Kobos' employment.

**Plaintiffs' Argument of Pretext**

Because defendants rebutted the presumption of discrimination, the burden shifts back to Mr. Kobos to establish that defendants' stated reasons for the adverse employment action was pretext for unlawful discrimination. *Bradley v. Harcourt, Brace and Co.*, 104 F. 3d 267, 270 (9th Cir. 1996). Mr. Kobos may establish "pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang v. U.C. Cal., Davis Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000) (citing *Godwin v. Hung Wesson, Inc.*, 150 F.3d 1217, 1220-21 (9th Cir. 1998)).  Mr. Kobos must provide "specific, substantial evidence" that the reasons given were a pretext for discrimination. *Bradley*, 104 F.3d at 270.  In addition, Mr. Kobos must establish that there was a causal connection between his protected status and the adverse employment action. *Mixon v. Fair Employment & Housing Comm.*, 192 Cal. App. 3d 1306, 1317 (1987). Mr. Kobos must provide evidence that his protected class "actually played a role" and "had a determinative influence" on his termination. *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993); *Mixon*, 192 Cal. App. 3d 1306, 1317 (1987).  To survive summary judgment, Mr. Kobos must  "go beyond the pleadings ...[to] designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

In his reply, Mr. Kobos maintains that defendants wrongfully terminated him because of his disability.  Mr. Kobos argues that the:

> facts demonstrate the existence of a genuine issue of material fact with regard to Plaintiff's disability claims.  They show that the Plaintiff was injured while he was working as a sales person on his shadow day.  They show that defendant Schwan's knew or should have known about the disabling injury because the accident was witnessed by a supervisor, Eubanks, who had a duty to inform his employer.  They show that Schwan's manager caused the breakdown of the disability evaluation and accommodation process at the time of the injury by his failure to initiate any investigation into the cause of the injury whatsoever.  In short the facts establish a case of disability discrimination against a job applicant.

17

(Kobos Opp., pp. 10-11).  Even if this Court accepts as true Mr. Kobos' presentation of the facts, and draws all references in Mr. Kobos' favor, Mr. Kobos fails to establish a triable issue of fact on his disability discrimination claim.

Mr. Kobos' argument ignores his burden to establish that the adverse employment action was pretext for unlawful discrimination.  To survive summary judgment, Mr. Kobos must do more than establish a prima facie case and deny the defendants' credibility.  *Bradley*, 104 F.3d at 270.  In his opposition, Mr. Kobos has provided no meaningful evidence to indicate that defendants' reason for terminating him was false, or that defendants' harbored discriminatory animus towards Mr. Kobos because of his ankle injury or worker's compensation claims.  Mr. Kobos fails to produce "specific, substantial evidence of pretext." *Id*.  To the contrary, Mr. Kobos admits the facts underlying defendants' reason for termination, and produces no evidence to support his complicated conspiracy theory of termination.  Although Mr. Kobos can demonstrate pretext indirectly, by showing that the employer's proffered explanation is "unworthy of credence," *Chuang*, 225 F.3d at 1127, Mr. Kobos' opposition establishes that *his* proffered explanation is "unworthy of credence, internally inconsistent, and otherwise not believable." *Id*.

The undisputed facts establish a strong inference that defendants' decision to terminate Mr. Kobos' employment lacked discriminatory intent.  "Where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Bradley*, 104 F.3d at 270-271.  Mr. Houselog, who recommended that Mr. Kobos be terminated in December 2008, is the same person who hired Mr. Kobos in September 2008.  Mr. Houselog was aware at the time he hired Mr. Kobos that Mr. Kobos had injured his ankle in February 2008.  "An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir.1995), *cert. denied*, 516 U.S. 1078 (1996).  Mr. Kobos has failed to produce any evidence to rebut this presumption.

Because Mr. Kobos produced no evidence to raise a triable issue of fact as to whether defendants' reason for discharge was pretext for an improper discriminatory motive, this Court grants defendants' motion for summary judgment on his disability discrimination claim.

18

**Retaliation**

Mr. Kobos asserts a retaliation claim in violation of FEHA in his fourth cause of action.  To establish a prima facie case of retaliation under California law, Mr. Kobos must prove that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action. *Morgan v. Regents of Univ. of California*, 88 Cal. App. 4th 52, 69 (2000).

Mr. Kobos fails to establish that he engaged in protected activity.  To establish a retaliation claim, Mr. Kobos must establish that he "opposed any practices forbidden" by FEHA, Cal. Gov't Code §12940(h), or that he engaged in protected activity. *E.E.O.C. v. Crown Zellerbach Corp*., 720 F.2d 1008, 1012 (9th Cir. 1983).  In opposition, Mr. Kobos argues that the following "facts" demonstrate the existence of a genuine issue of material fact regarding his retaliation claim:

> The evidence reveals a pattern of interconnected events: ignoring a known injury that entitled Plaintiff to obtain workers' compensation benefits; misleading the Plaintiff as to his right to file a claim; a calculated effort to stay in touch with the Plaintiff in order to get him to reapply for the job and fill out the same paperwork all over again to obtain a signature on the waiver form.
>     Having lured Plaintiff back [sic] they had to hire him whether they wanted to employ him or not.  The conditional hiring led, according to the undisputed facts, to informal training where Plaintiff was required to solicit business door to door without giving him all the information he needed to complete his assignment.  This, [sic] in turn led to a confrontation with his superiors that upset Plaintiff so much he walked away from the situation.  His walking away from the discussion was deemed insubordination and he was fired.
>     The totality of the circumstances, viewed in light of the above facts...reveals that the moving defendants hired Plaintiff after denying him workers' compensation benefits for an injury he suffered auditioning for the job in order to cover up the failure to provide workers' compensation benefits in the first place.  This in turn required them to engage in a systemic retaliatory campaign to impair Plaintiff's job performance in order to generate a legitimate business reason to termination in the event he ever discovered the initial workers' compensation [sic] discrimination.  Therefore the motions [sic] as they relate to Plaintiff's, [sic] retaliation claims must be denied.

In their memorandum, defendants point out the absence of facts to establish that Mr. Kobos engaged in protected activity.  The "protected activity" in a retaliation case refers to an employee's statement that is "opposed to an unlawful employment practice." *E.E.O.C.,* 720 F.2d at 1012.  There are no facts to support a claim that Mr. Kobos made a statement that was opposed to an unlawful employment practice while he was employed at Schwan's.  Although he presents an elaborate scheme, Mr. Kobos ignores

19

1  defendants' argument, and fails to establish this required element.[6]  Because Mr. Kobos fails to establish

2  a prima facie case for his retaliation claims, defendants are entitled to summary adjudication in their

3  favor on Mr. Kobos' retaliation cause of action.

4  **Failure to Prevent**

5        In Mr. Kobos' sixth cause of action, he asserts a failure to prevent disability discrimination and

6  retaliation claim against defendants.  Because this Court finds that Mr. Kobos' wrongful termination,

7  disability discrimination, and retaliation claims fail, and for the reasons set forth more fully above,

8  defendants are entitled to summary adjudication in their favor on Mr. Kobos' failure to prevent claim.

9  **Intentional Infliction of Emotional Distress**

10       Mr. Kobos' tenth cause of action asserts an intentional infliction of emotional distress claim

11  against defendants.  To prevail on a claim of intentional infliction of emotional distress, Mr. Kobos must

12  prove: (1) extreme and outrageous conduct with the intent to cause, or reckless disregard of the

13  probability of causing emotional distress; (2) that he suffered severe or extreme emotional distress; and

14  (3) that the outrageous conduct was the actual and proximate cause of his injuries. *Cochran v. Cochran*,

15  65 Cal. App. 4th 488, 494 (1998).

16       To meet the first element, the alleged conduct "must be so extreme as to exceed all bounds of

17  that usually tolerated in a civilized community." *Id*.  "Liability has been found only where the conduct

18  has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

19  decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. at 496.

20  "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" are insufficient

21  to warrant liability. *Hughes v. Pair*, 46 Cal.4th , 1035, 1051 (2009).

22       Mr. Kobos' claim for intentional infliction of emotional distress fails to meet the first element

23  set forth in *Cochran*.  The allegations raised by Mr. Kobos in the course of discovery are that: (1) Mr.

24  Houselog had a conversation with Mr. Kobos regarding his job performance on December 8, 2008 in

25  which Mr. Houselog asked him questions over and over again about the map, and building forms, and

26  told Mr. Kobos to go outside; (2) Mr. Houselog concealed information from Mr. Kobos that was vital

27

28       [6]Although filing a workers' compensation claim may be protected activity, Mr. Kobos argues, contrary to the evidence, that he did not file a workers' compensation claim.

1  to his productivity; (3) Mr. Houselog kept Mr. Kobos "in the dark" with regard to his suspension; and

2  (4) Mr. Houselog forced Mr. Kobos to conduct door-to-door sales on foot while he was injured. Even

3  if this Court accepts as true these allegations, the conduct does not rise above "mere insults, indignities,

4  threats, annoyances, petty oppressions or other trivialities." *Id*.

5       In his opposition, Mr. Kobos asserts that Mr. Houselog's alleged conduct was extreme and

6  outrageous per se, because it was discriminatory. In support of this argument, Mr. Kobos relies on

7  authority related to national origin discrimination, sexual orientation discrimination, and sexual

8  harassment. None of those claims is at issue in this case. Assuming Mr. Kobos could cite authority

9  linking workers' compensation discrimination and disability discrimination to per se extreme and

10 outrageous conduct, Mr. Kobos makes no such allegations against defendants. As discussed more fully

11 above, Mr. Kobos fails to establish a discrimination claim.

12      In addition, Mr. Kobos' claim for intentional infliction of emotional distress fails the second

13 *Cochran* requirement. Severe emotional distress means, "emotional distress of such substantial quality

14 or enduring quality that no reasonable person in civilized society should be expected to endure it."

15 *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1004 (1993). Mr. Kobos fails to demonstrate

16 "specific facts, as opposed to allegations, showing the existence of a genuine issue for trial" on whether

17 he suffered several or extreme emotional distress. *Nilsson*, 854 F.2d at 1545. Accordingly, defendants'

18 "supported summary judgment motion will be granted." *Id*.

19      In the alternative, Mr. Kobos' intentional infliction of emotional distress claim is barred by the

20 exclusivity provision of California's Workers' Compensation Act. "When the employee's claim is based

21 on conduct normally occurring in the workplace, it is within the exclusive jurisdiction of the Worker's

22 Compensation Appeals Board." *Cole v. Fair Oaks Fire Prot. Dist.*, 43 Cal. 3d 148, 151 (1987). Where

23 the alleged conduct "occurred at the worksite, in the normal course of the employee-employer

24 relationship," workers' compensation is the exclusive remedy for any alleged injuries that may have

25 resulted. *Miklosy v. Regents of Univ. of California*, 44 Cal. 4th 876 (2008). Because the alleged

26 wrongful conduct by defendants occurred in the course and scope of Mr. Kobos' employment, his

27 "emotional distress injuries are subsumed under the exclusive remedy provisions of workers'

28 compensation." *Id*. For the foregoing reasons, this Court grants summary adjudication in favor of

1   defendants and against Mr. Kobos on Mr. Kobos' claim of intentional infliction of emotional distress.

2                                            CONCLUSION

3           For the foregoing reasons, this Court GRANTS summary judgment in favor of defendants and

4   against Mr. Kobos and DIRECTS the clerk of court to enter judgment in favor of defendants and against

5   Mr. Kobos and close this action.

6           IT IS SO ORDERED.

7   **Dated:    August 6, 2010**                       /s/ Lawrence J. O'Neill
                                               UNITED STATES DISTRICT JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28